JOHN T. BIRD, HENRY C. PITNEY, JOHN R. EMERY AND
ALFRED REED, VICE-CHANCELLORS.

––––––––––

J. PIERSON VREELAND

*v.*

J. BEACH VREELAND, ELIZABETH V. D. GOULD, ADELIA
VREELAND et al.

1. Where a farmer, seventy years of age, residing on a farm about five miles
from the city of Paterson, with an invalid wife and daughter, and another
daughter who was about to marry and leave home, proposed to his eldest son,
who was engaged in business in Paterson, that if that son and his wife would
take up their residence at the farm and there make a home for the parents for
the parents' lives, that he would give the son the farm under specified limita-

tions, and the son accepted the proposition, and thereafter, with his wife, moved to the farm, and, to the detriment of his business and by the labor of his wife and himself, fully performed upon his part the agreement made by the proposition and its acceptance—*Held*, that at the instance of the son, equity will compel the performance of the agreement upon the part of the father.

2. It is essential to the validity of such an agreement that it shall be mutual and, as well, definite and certain both as to its terms and subject-matter.

3. Such an agreement must be clearly proved and it must also be plainly established that the performance relied upon was referable to and consequent upon the agreement, for the purpose of carrying it into effect.

On bill for specific performance, answer, replication and proofs.

*Mr. John W. Griggs*, for the complainant.

*Mv. John S. Barkalow*, for the answering defendants.

THE CHANCELLOR.

The complainant alleges that, in the month of April, 1883, his father, Cornelius D. Vreeland, was seized of a farm in the county of Passaic upon which he then resided with his wife, Rachel, and his two daughters, Elizabeth and Adelia; that his parents were advanced in age, the father being over seventy and his mother sixty-five years old; that the mother was feeble and nearly blind, because of cataracts in her eyes; that his sister Adelia was subject to epileptic fits and fainting spells which affected her mind and incapacitated her for domestic responsibility, and his sister Elizabeth had married Joseph P. Gould and had determined to leave her parents and establish a new home with her husband; that the complainant then resided in the city of Paterson, some five miles from his father's farm, with his wife and only child, Cornelius D. Vreeland, named after the grandfather, where he conducted a horse feed business; that the father besought him to move to the farm with his wife and child so that his wife might superintend the household and he might advise and assist the father, as the father grew older, in the management of the farm; that it was verbally agreed, between him and his father, that he should move to the farm and help

Vreeland v. Vreeland.

in its care, and make a home for his father and mother as long as they might desire to live there, and that in consideration of his doing so his father would give him a deed of the farm which should convey to him an estate for life with the remainder in fee to his son in case his son should survive him, and a fee to him at the death of the son if he should survive the son, and should clothe him with power to sell the farm after the death of the father and mother, the proceeds of such a sale to be so invested that the income would go to him during his life, and the principal to his son after his death if the son should survive him; that in pursuance of the agreement, at personal inconvenience to himself and his wife, and in detriment to his business, on the 18th of May, 1883, after Mrs. Gould had left her parents, with his wife and son he moved to the farm and there fully performed the agreement upon his part until the death of his mother in March, 1887, and the death of his father on the 6th of July, 1890; and that the father died intestate, leaving him surviving, as his heirs-at-law, the complainant, a son named J. Beach Vreeland and the daughters before mentioned, having first prepared and executed a deed to carry out the agreement alleged, but having failed to legally effectuate its delivery to the complainant.

Upon the case thus stated he seeks a decree which will secure the specific performance of the agreement referred to.

That equity will specifically enforce such a parol agreement, at the instance of a complainant who shall have completely performed it upon his part, is now established, in this state, beyond controversy. The remedy is afforded upon the ground that it will work a fraud upon him who, induced by the agreement, has in good faith so performed it as to irretrievably change the situation of the parties to his disadvantage, to permit the other party to refuse fulfillment upon his part. It has had frequent recognition and application in adjudged cases in our courts. *Casler* v. *Thompson, 3 Gr. Ch. 59; France* v. *France, 4 Halst. Ch. 650; Johnson* v. *Hubbel, 2 Stock. 332; Van Dyne* v. *Vreeland, 3 Stock. 370; S. C., 1 Beas. 142; Davison* v. *Davison, 2 Beas. 246; Cooper* v. *Carlisle, 2 C. E. Gr. 529; Brewer* v. *Wilson,*

*2 C. E. Gr. 180; Eyre v. Eyre, 4 C. E. Gr. 102; Brown v. Brown, 6 Stew. Eq. 657; Larison v. Polhemus, 9 Stew. Eq. 506; Schutt v. Missionary Society &c., 14 Stew. Eq. 115; Pflugar v. Pultz, 16 Stew. Eq. 440; Young v. Young, 18 Stew. Eq. 27; S. C., 6 Dick. Ch. Rep. 491; Nibert v. Baghurst, 2 Dick. Ch. Rep. 207; Drake v. Lanning, 4 Dick. Ch. Rep. 452.*

But a parol agreement of this character, because of the situation and relations of the parties to it and the consequent opportunity for the perpetration of fraud, is regarded with suspicion, and, when its enforcement is sought, is subjected to close scrutiny. It must not only be mutual, but also definite and certain, both in its terms and as to its subject-matter, and it must be clearly proved. *Cooper* v. *Carlisle* and *Brown* v. *Brown, supra.* So, also, it must plainly appear that that which is alleged as part performance is referable to and was consequent upon the contracts alone, for the purpose of carrying it into effect. *Eyre* v. *Eyre, supra; Pom. Spec. Perf.* §§ *108, 109.*

The proofs establish that the complainant broke up his home in Paterson on the 18th day of May, 1883, and went with his wife and son to live with his father, and that the wife undertook the supervision and control of the father's household and the complainant from time to time assisted in the care and management of the farm, and that they lived together in this way until both the father and mother died. During the same time the complainant continued his business in Paterson, but at such disadvantage, because of his inability to give it his undivided attention, that it gradually lost its value.

The complainant testified that he gave up his home in Paterson, went upon the farm to live and sacrificed his business, in the execution of an agreement between him and his father, and also to the terms of that agreement.

That he was a competent witness touching those matters, in this suit, where the defendants are not sued in a representative capacity but for property to which they hold title descended to them from their father, is settled. *Hodge* v. *Coriell, 15 Vr. 456; Palmateer* v. *Tilton, 13 Stew. Eq. 555; Crimmins* v. *Crimmins, 16 Stew. Eq. 86; Smith* v. *Smith, 23 Vr. 210.*

His testimony is that his father came to him in Paterson in February, 1883, and told him that Mrs. Gould was about to marry, when she would go away with her husband, and then there would be no one to take care of the house, and proposed that the complainant should go to the farm and make his home there, and promised that if he would do so he would give him a deed for the farm as soon as he could have it prepared, and also would give him the stock and utensils that were upon the farm. The complainant did not reply to the proposition until May, when he said to his father :

" Well, I have talked it over with my family, and if you will give me all the farm and a deed for it, and the utensils and stock, I will go up there and make a home for you and do the best I can."

He further says :

" It was agreed between he and I that the deed—or he asked me if I had any objections—entail to myself, and I said no, for I did not expect to sell it. He said, ' Well, I would like to have Corny to have it after you are through, and if you don't mind I'll give it to him after you're through with it ; I will make a provision so that if anything should occur and you wish to sell, you would have the right to sell it ; but the principal of the money that you receive for it I want to go to your son.' "

He further testified that it was agreed that the father was to pay all expenses at the farm both in its maintenance and in support of the family there.

After he went upon the farm, he says that the deed was not forthcoming as he expected, and he demanded it from his father and threatened to return to Paterson if he did not get it. Matters continued in this attitude until the fall of 1884, when, he says, his father brought a deed to his store in Paterson and exhibited it to him, saying, " Here is the deed of the farm which I promised you. It is all right. You can now go on and do as you like. It is yours." And then he examined the deed and handing it back to his father told him to take it home and put it away with the father's papers.

That deed has been offered in evidence. It is a quit-claim deed from the father to him, dated on the 14th day of June,

1884, purporting, in consideration of $1 and the natural love and affection which the father bore to him, to remise, release and forever quit-claim to him the lands described in the bill, with a *habendum* to him and his heirs and assigns forever. After the description of the property in the deed, and immediately preceding the *habendum*, is this clause:

"It is distinctly understood and agreed, by and between the parties hereto, that the lands above described are conveyed to the said Josiah P. Vreeland, as follows, to wit: The said Cornelius D. Vreeland and Rachel, his wife, reserve the right to remain upon said farm and make the same their home as long as they or either of them shall live, if they should so desire; and, further, that the said Josiah P. Vreeland is not to sell or dispose of said premises before the death of both said Cornelius D. Vreeland and Rachel Vreeland, his wife, without the consent of each of them or the survivor of them in writing first had and obtained; and that said lands and premises are conveyed to the said Josiah P. Vreeland, to be used and enjoyed by him for and during his natural life, and at his death the same shall vest in and go in fee-simple to Cornelius D. Vreeland, the son of said Josiah P. Vreeland, but in case the said Cornelius D. Vreeland, his son, shall die before the said Josiah P. Vreeland, then the lands above described shall vest in fee-simple to the said Josiah P. Vreeland forever, and the said Josiah P. Vreeland is to have the right to sell and dispose of said lands and premises, or any part thereof, at any time he may see fit, and the proceeds derived therefrom is to be invested in some safe and good securities which shall be for the benefit of the said Cornelius D. Vreeland, Jr., provided he shall survive the said Josiah P. Vreeland. Said lands and premises not to be sold, however, until after the decease of both the said Cornelius D. Vreeland and his wife, Rachel Vreeland, and in case of sale after their death the said Josiah P. Vreeland is to make and execute a good and sufficient deed or deeds to the purchaser or purchasers thereof."

The witness further states that, in January, 1888, his father made a more formal delivery of the deed, together with other papers, to him, and he then put all the papers back in a box in which his father kept his valuable papers, and, putting the box in the father's trunk, locked it in his father's closet, saying that it would be as safe there as anywhere.

It appears that the papers thus claimed to have been delivered to him consisted of fifteen deeds, seven of which were in his favor, the one now in question being dated as stated, in June, 1884, and the other six, together with the remaining eight deeds, bearing date in 1887.

Unfortunately for the complainant's credit in this suit, his contention that this deed was delivered to him with the other papers mentioned, has been the subject of litigation between the parties here concerned in another cause in this court, which was decided against the complainant in 1891 ( *Vreeland* v. *Vreeland, 8 Dick. Ch. Rep. 56*), and in the court of errors and appeals, in 1892 (*4 Dick. Ch. Rep. 322*), by deliverances which throw serious doubt upon his veracity and stigmatize his attitude towards his brother and sisters, in the matter of his father's estate, as rapacious and unjust. Viewing his testimony in the light of that adjudication, and as well in the light of the influence of his interest in the event of this suit, the necessity for strong corroborative proof of his assertions to justify the decree sought, is apparent. And, in addition to this, the terms of the agreement charging the father, as they do, with all expenditures in the maintenance of the farm and household for the remainder of his life, and the transfer of the farm, together with its implements and stock, import a hard bargain and an improbable one, which should have credence in nothing less than the most convincing proofs. We naturally, then, depend upon the evidence which has been offered in corroboration of the complainant's statements.

Nine witnesses have been produced and have testified to statements by the father. The first is John C. Cruikshank, who is a clergyman, eighty-two years old, and the father of the complainant's wife. He knew the senior Vreeland for nearly forty years prior to his death and at one time was his pastor. For a quarter of a century he was the superintendent of the public schools in Passaic county. He gives evidence which, save for his relationship to the complainant, appears to be beyond criticism. It is that, in March, 1883, Mr. Vreeland expressed a desire to him that he would encourage the complainant's wife to move to the farm and undertake the care of the household there; that he objected that such a course would increase the complainant's expenses of living, and thereupon Mr. Vreeland declared that he, Vreeland, would bear all the expenses, and added:

"Now, understand, I propose to give him the farm at Summer Hill, with its stock and farming utensils, independent of any other property which he may inherit from my estate. I give him a deed of the Summer Hill farm, that it may pass through him as a legacy to my grandson, C. D. Vreeland. Should circumstances occur that Pierson might think it advantageous to sell, I wish that the amount that the farm may bring be held in trust for my grandson as a legacy."

The witness further says that he communicated this proposition to his daughter, and that in the month of June in the same year, at the farm, Mr. Vreeland told him that the proposition had been accepted, and that the complainant and his wife were there.

Still further he testifies that in June, 1890, the month before Mr. Vreeland died, at the farm, Mr. Vreeland spoke of the time when his grandson Cornelius would be in possession of the farm and, among other things said :

"It is my pride, my pleasure, that the name of C. D. Vreeland, after I am gone and Pierson has gone, will be owner and possessor of the Summer Hill farm. I want that name kept over the farm. He is my grandson, born in this house, and, Dominie, I am proud of him."

Another witness is Ellen Vreeland, the widow of a cousin of Cornelius Vreeland. She testifies that in the fall of 1884, as she was driving to Caldwell with Mr. Vreeland, he told her how he wanted the complainant to make his home on the farm after Mrs. Gould married, and that he had made an agreement with the complainant that if he would come and take charge of the place and make a home for him, Vreeland, and his wife, he would give him the farm and make him a deed for it; that it would be his then to deal with as he pleased. He said that he had not yet given the deed; that the complainant wanted it, but had his word, and he would do what he promised, and the complainant should have the deed when he got ready to give it.

Another witness was Garret V. Snyder, a cousin of Cornelius D. Vreeland, some forty years his junior in age, employed in a grocery store in Paterson. This witness states that in April, 1883, Mr. Vreeland came to the store in which he was engaged to make some purchases, and in course of conversation was asked

Vreeland *v.* Vreeland.

by him if the complainant was going to move into the country, and replied in the affirmative, adding:

"I, have always promised him the place and I have told him if he would move back up there and take care of me and the old lady I will give him a deed for the property."

Isaac H. Voorhees, of Paterson, who knew Mr. Vreeland intimately for some eighteen years, testifies that before the complainant went to live upon the farm, Mr. Vreeland said that he had offered to give him the farm and everything that was on it if he would come to it, and later, that Mr. Vreeland told him that the complainant was coming to the farm to live, and that he, Vreeland, had agreed to give him the farm just as it was.

George W. Colfax says that he was tax collector of the township in which the farm was located and that Mr. Vreeland told him once that he had made an arrangement with the complainant to come home and had given him the farm, but that he, Vreeland, was to pay the taxes upon it as long as he lived.

William H. Van Houten and his brother Henry, who were neighbors of Mr. Vreeland, speak of an occasion in the spring of 1883, when they went to Mr. Vreeland's farm to purchase a cow, and he told them that he had made a proposition to the complainant that if he would move to the farm and there take care of him and his wife the place should be the complainant's, but the complainant had not yet made a decided answer to his offer.

Grandine V. Zeliff, a neighboring farmer, testifies that, in 1889, Mr. Vreeland told him that he had given the farm to the complainant for making a home there for Vreeland and his wife.

William H. Gray, formerly a hired man of the complainant, testifies that in the spring of 1883, some four or six weeks, he thinks, before the complainant moved to the farm, at the complainant's store in Paterson, he was hitching up Mr. Vreeland's horse, when Mr. Vreeland asked him whether the complainant had said anything to him about the complainant's going back to the farm, and, upon the witness replying in the negative and inquiring why the question was asked, answered:

Vreeland *v.* Vreeland.

"Because I have promised tô give him a deed if he comes back on the farm to make a home for me and my wife, and he is a little bit dilatory about coming back, and I thought I would ask you if he had said anything about it."

In addition to this testimony is the deed referred to, which, though not delivered, was unquestionably signed and acknowledged by Mr. Vreeland and, according to the complainant, was prepared entirely under his direction, and after its preparation was exhibited to and acquiesced in by the complainant.

I think that this testimony and the deed sufficiently corroborate the complainant to entitle him to the relief he seeks. I am satisfied that Cornelius Vreeland, impressed with the helplessness of his household, after the marriage of Mrs. Gould, because of the advancing age of his wife and himself and the afflictions of his wife and unmarried daughter, deemed it best to secure the watchful care of his son and daughter-in-law for the price suggested in the agreement. Besides this, the agreement enabled him to gratify his pride in his name by limiting the principal part of the consideration he was to give to the grandson who bore that name. The price he paid appears to have been a large one, but it is impossible to say that it was in any respect unconscionable. It may be that as remuneration for the depreciation in the value of the complainant's business, the complainant's attention to his father's affairs and his wife's unremitting care of the household matters, it did not exceed that which was just. It is difficult to precisely fix the value of such services.

It has been suggested that the promise of the farm may have been intended by way of advancement, but I think that suggestion is answered by the testimony of Mr. Cruikshank to the effect that the conveyance of the farm was to be independent of the complainant's inheritance from his father.

I think, also, that all doubt as to what was intended to be included within the term "Summer Hill Farm" is settled by the description contained in the deed.

I will decree that the agreement shall be specifically performed.