The complainants, H. Ely Havens, Allen D. Havens and Michael Giff, allege that in June, 1911, they entered into an agreement with Oliver H. Brown, now deceased, whereby Brown agreed to purchase for them a certain lot, one hundred by one hundred and fifty feet, on Clifton avenue, Lakewood, erect on it a store building, and stock the store with house furnishing goods and hardware, and to hold the same in trust for them (fifty per cent. for H. Ely Havens and twenty-five per cent. for each of the other complainants); that Brown was to retain the legal title to the property during his lifetime and to reserve to himself from the net profits of the business an amount approximately equal to the interest on his investment, which was agreed upon to be $3,000 per *Page 76 
annum. That they had been Brown's employes for many years in his furniture store in Lakewood, which he had just then sold, and that they were about to become associated with others in a similar line in Lakewood, and they set up as a consideration for Brown's undertaking that they, or some of them, would, during Brown's lifetime, continue to work for him during the summer seasons in his furniture store at Spring Lake, and that they would not engage in any competing or other business than that in the Lakewood store. That Brown bought the land, taking title in his own name, built the store and stocked it, and put them in possession September 12th, 1912, and that they exclusively operated and conducted the business as their sole and separate property until the death of Brown, April 1st, 1924; that they devoted their whole time and attention to building up the business, worked for Brown during the summer seasons at his Spring Lake store, and that they drew but small weekly salaries for their necessary support, and as a result they have materially increased the business and the value of the same; that they put back into the business all the profits except the weekly drawings and the amount paid to Brown annually, representing the interest on his outlay; that the services performed by them for Brown were of such special and exceptional character that they could not be adequately measured by ordinary pecuniary standards, and that it was not the intention of the parties to so measure them; that they took over the premises as their own separate property "subject to the trust agreement entered into between them and the said Brown whereby the said Brown was to hold the legal title to said premises in order to enable him to have the advantage of the special services rendered by the complainants, or some of them, in said Brown's separate business at Spring Lake." The prayer is that Brown's executors be decreed to convey the lands, building and merchandise in the store.
Brown, for many years and up until his death, had furniture stores at Spring Lake, Asbury Park and Lakewood. He was a self-trained business man, shrewd and close in trade, *Page 77 
and he prospered, leaving a large estate. In 1911 he sold his Lakewood store intending to quit the town, and the two Havens, who long had been his clerks, and Giff, then a mere boy, who had driven his delivery, were out of jobs. In June, 1912, he bought the site on Clifton avenue, Lakewood, for $15,000, put up a store at a cost approximated at $11,000 and stocked it with $10,000 worth of merchandise. Business started in September, 1912. H. Ely Havens took over the management. The other two complainants assisted in the store. It was left to them to buy and sell the merchandise, hire the help and to carry on with little or no supervision by Brown. The business was carried on in the name of O.H. Brown. His credit was used, and accounts were billed in his name. The store's bank account was in Brown's name, and he signed all checks — in blank and in batches — to be filled out by the Havenses as the business required. All accounts were paid out of the store's resources, but not with Brown's accustomed promptness practiced by him in his Spring Lake and Asbury Park stores, to which thereafter he devoted his activities. A new set of books was started and careful accounts kept of the store's dealings with Brown and his Spring Lake and Asbury Park stores, from and to which goods were bought and sold. Brown, who had given his former Lakewood store personal attention, stopped in at the new one only about once a month, and then casually while in town attending directors' meetings of a local bank. Statements of the condition of the business — its assets and liabilities — were rendered annually by the Havenses to him, and he paid the federal tax on the income as his personal income. In 1915 Brown made additions to the Lakewood store at a cost of $9,400, some of which was paid out of the proceeds of the store and charged to Brown, and the balance, $6,900, was paid by Brown. The interest on a mortgage of $10,000 on the premises was paid out of the business, and in 1918 $4,265.17 of the principal was paid out of the store's proceeds and the balance by Brown. A lease on part of the premises to a tenant was negotiated by Havens in the name of Brown, and the rent was paid by check to the order of *Page 78 
Brown and used in the business. Brown's withdrawal from the Lakewood store amounted to, as the complainants say, $15,794.17, and, as stated by the defendant, $20,394.05. His total investment was, approximately, $35,000, and the profits of the store during the years of operation were, it is said, $70,000. This is the background of the following testimony offered by the complainants of declarations made by Brown, which it is argued tend to prove that he bought and held the property in trust for the complainants.
In the negotiations for the land Brown said to the owner, "I am buying this property — I want this property for these boys [complainants]. They have been good boys." To the managing editor of a local paper, in which he wanted a news ad. for the new store, Brown said "that he had bought this property and built this new store across the street. They were moving out of the old store, and that the Havens boys and Mr. Giff were the new owners of this property." The news item, after describing the store, reads: "It is undoubtedly interesting to the patrons of the store and the friends of H. Ely Havens that, after twenty-one years connection with Mr. O.H. Brown in the furniture business, he and his brother, Allen D., and also Michael Giff, have been taken into the business and now have an interest in the store." Five traveling salesmen, who sold him goods for his Spring Lake and Asbury Park stores, upon being solicited for trade with the Lakewood store, were referred by Brown to the Havens brothers or Ely Havens, and to one of them he said, "I have nothing to do with that store," and to another, "I have not anything to do with it. * * * You got to see the Havens brothers; they are the ones you have got to see. They do their own ordering there, and they are right there." To his life-long friend Dwyer, who, in 1921, commented on how hard the boys were working, Brown retorted, "Well, why shouldn't they work very hard?" and being asked why, he replied, "Because they practically own that business," and "your little friend Mike is also interested." To a customer in his store in Spring Lake (Mrs. Thornton), upon whom Brown was waiting, and who asked for articles similar to *Page 79 
those she had purchased at the Lakewood store, and was told that if she was Ely Havens' customer to go back there and get them, as he did not want to bother with Ely Havens' customers, upon being queried, "Why, its your store, Mr. Brown," he replied, "Mine with a string to it," and when she remarked "I have had gifts like that myself," he answered, "Well, they sort of lease it," and then, upon her remarking how hard the boys worked, he said that "Well, there is no credit to any man when he is working for himself." To two witnesses, who solicited him for advertisements and subscriptions to a local newspaper, Brown said he had nothing to do with the Lakewood store, and referred them to Mr. Havens, or to Ely, Allen and Mike. To a clerk in his Spring Lake store (Warner), who was getting out some draperies for one of Brown's numerous seashore cottages, he said: "That is right. I am glad to see you fix that up. I got to look to you fellows to do this. I am not able. [This was in 1923. Brown suffered a stroke in 1921.] You take care of them and I will take care of you. The Lakewood store I have nothing to do with; that belongs to Ely, Allen and Mike. I will fix this store the same." (For the witness, as he thought), Brown told his chauffeur, who wanted some repair instruments from the Lakewood store, that "You'll have to ask Ely. I have got nothing to do with it. You will have to take it up with him." To a real estate agent (Rau), who asked him if he wanted to sell his Lakewood store, he replied, "It is up to the Havens' boys, and I will take it up with them for you." One witness overheard Brown says to the manager of a local hotel "that he never would have built the store in Lakewood again after he had sold the old store if it had not been for the boys." Dr. Disbrow, in a casual conversation, asked Brown why he had sold his corner store and built in the middle of the block, to which he answered, "Well, I'll tell you, Doctor, how it was. Ivan Thompson was after me all the time to get that corner. I set a price on it and he took me up. I didn't care to do business any more anyway, and I thought to let the thing go. But the boys come to me. They have been with me a number of years. They are sort of half *Page 80 
crying over the thing — it throwed them out of work — they wouldn't have anything to do, puts them in a bad place. Why, I felt sorry for the boys — I can buy the Broderick place and put them up a store so that they can have something to do to work on. I don't care about it myself, but the boys feel awfully about that — they were out in the cold." Dr. Disbrow says that Brown also stated that "they had not sufficient means themselves to go on with the business, so he came to their rescue."
The complainants were barred by the statute and objections from testifying.
There is not a word of proof of an agreement by Brown to hold the property in trust for the complainants during his lifetime, and that they, in consideration, agreed not to engage in a competing business, and that they, or some of them, would work for him during the summer season in his store at Spring Lake, and that he was to have the interest on his investment fixed at $3,000 annually — the alleged contract upon which the complainants base their action. Nor is it an admissible deduction from the history of the case that the contract set up by the bill was the basis of the relation between the complainants and Brown. That there was some arrangement between them, not common to the ordinary relation of master and servant, is manifest. The case as made out is not inconsistent with that relationship and the promise of a reward of some kind, but that it was Brown's undertaking that he was, during his lifetime, to be a mere trustee and these complainants the beneficial owners of his land, store and stock is highly improbable, and is challenged by his continued ownership and control of the property and business. And the yearly reports rendered by complainants to him of the status of the business, and the payments by him of the income tax on the annual profits of the business, to their knowledge, were sensible acknowledgments that their interest, whatever it was, was subordinate to his ownership. The case also suggests the idea that Brown had set them up and backed them in the business, but his grip on the property and business until his death *Page 81 
leaves the impression that this was not unconditional and independent. What the arrangement was rests in speculation, not proof. That he agreed to buy and hold the land and building in trust for the complainants is not even a permissible surmise.
A thing that attracts attention is, why, if the complainants were the equitable owners of Brown's Lakewood store, they did not have their rights reduced to writing, or have it declared, in equity, in Brown's lifetime, when he could have assented or defended, and especially why this was not done in the last three years of his life, after the stroke, when it was apparent that his days were numbered?
The contract sued upon rests entirely in parol. To guard against fraud upon estate the law requires that such contracts must be clearly proven. To justify a decree of specific performance, which in this case would take from the Brown estate and give to the complainants' property, worth $100,000 and upwards, the proof must be certain, definite, reliable and convincing. Vreeland v. Vreeland, 53 N.J. Eq. 387; Cooper v.Colson, 66 N.J. Eq. 328; Midmer v. Midmer Executors, 26 N.J. Eq. 299; Cutler v. Tuttle, 19 N.J. Eq. 549. The question of whether this oral contract is taken out of the statute of frauds by part performance is not considered. The exceptional character of the services rendered, and relied upon as part performance, consisted of clerking in Brown's Spring Lake store and laying linoleum, oilcloth and carpets for his customers, the value of which may be easily estimated. Such services would appear to be not sufficient part performance. Cooper v. Colson, supra. The other alleged consideration, that the complainants would refrain from engaging in a competing business with Brown in Lakewood, is fanciful. Brown had no business in Lakewood, and contemplated none with which there could be competition. "In every case, in order to take the case out of the statute on the ground of part performance, irrespective of other questions, two things are requisite. The terms of the contract must be established by the proofs to be clear, definite and unequivocal, and the acts relied on as part performance *Page 82 
must be exclusively referable to the contract." Cooper v.Colson, supra.
The complainants' proofs far from measure up to the standard fixed by law, and the bill will be dismissed.